# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND



| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | * |
| A SAMSUNG GALAXY G7 CELLPHONE, | * * * |
| A SAMSUNG GALAXY CORE PRIME CELLPHONE, | * * * |
| – AND – | * * |
| A NU VISION TABLET | * |

CASE NO. 19- 1750-CBD

FILED _____ LOGGED _____
ENTERED _____ RECEIVED _____

JUN 1 8 2019

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, Roger Wilson, being duly sworn, depose and state that:

## PURPOSE OF THE AFFIDAVIT

1.     This affidavit is made in support of an application for a warrant to search a Samsung Galaxy G7 cellphone, a Samsung Galaxy Core Prime cellphone and a Nu Vision tablet (hereinafter "Subject Property"), further described in Attachment A, for the items described in Attachment B; both Attachments are incorporated by reference.   As further described below, on May 6, 2019, this Court authorized the issuance of a complaint and arrest warrant for Kevin WILSON for alleged violations of the Sex Offender Registration and Notification Act (SORNA), Title 18, U.S.C. § 2250.   The Subject Property was seized pursuant to and in connection with the execution of the arrest warrant on May 9, 2019.   Following his initial appearance on that same date, WILSON was detained by consent.

1



## AFFIANT BACKGROUND

2.      I am a Senior Inspector with the United States Marshals Service (USMS).   I have been employed with the USMS for over 28 years.   I am currently assigned as the Sex Offender Program Coordinator for the Mid-Atlantic Region for the Sex Offender Investigations Branch. Among my duties, I am responsible for investigating crimes involving individuals who are convicted sex offenders and have failed to register as required by the SORNA.

3.      As a federal agent, I am authorized to investigate violations of laws of the United States.   I am also authorized to execute warrants issued under the authority of the United States.

4.      I am familiar with the information contained in this affidavit based upon the investigation I have conducted and based on my experience and conversations with other law enforcement officers who have engaged in numerous investigations involving failure to register or update a registration as required by the sex offender registration laws.

5.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.   As set forth herein, I respectfully submit that there is probable cause to believe that the items sought by this search warrant constitute evidence of violations of 18 U.S.C. § 2250.

## PROBABLE CAUSE

6.      On March 9, 2000, WILSON was convicted of two counts of First Degree Sexual Abuse in the Circuit Court for Monongalia County, West Virginia, in connection with his abuse of a minor.   He was sentenced on October 13, 2000, to between one year and five years' imprisonment on each count, to be served consecutively.

2

7.      According to records obtained from the West Virginia State Police, on or about October 13, 2004, when released from prison, WILSON completed with the West Virginia State Police a "Sex Offender Registration and Verification" form.   On or about December 22, 2004, WILSON received notification that under state law he was required to register as a sex offender for life.

8.      WILSON thereafter completed additional "Sex Offender Registration and Verification" forms on or about August 3, 2005, August 28, 2006, August 16, 2007, and September 13, 2007, all in West Virginia.

9.      On or about August 18, 2008, WILSON pled guilty to two counts of First Degree Sexual Abuse in the Circuit Court for Monongalia County, West Virginia, again for abuse of a minor, and one count of Failure to Register or Provide Notification of Registration Changes. He was sentenced on or about September 2, 2008, to between one year and five years' imprisonment on each count, to be served consecutively.

10.      On August 17, 2017, WILSON signed a Notification of Sex Offender Responsibility And Registration Certification, which confirmed WILSON's continued responsibility to register as a sex offender under West Virginia law, and to register with any state into which he moved, was employed, or was a student.   On that same date, concurrent with his release from prison, WILSON changed his registration address with the West Virginia State Police in Elkins, West Virginia.   WILSON advised he was moving out of state to 10 Hudson Street, Annapolis, Maryland.   This was the first time WILSON had registered an address outside of West Virginia.



11.     On January 18, 2018, the USMS received information that WILSON was living unregistered in the area of Grant Town, West Virginia.   After further investigation, information was developed that WILSON was possibly living with his associate, Individual 1, in the back of a white 1998 Ford box truck, which had been converted into a living space with two beds, a refrigerator and a generator.

12.     On January 31, 2018, I went to the homeless shelter located at 10 Hudson Street, Annapolis, Maryland, and interviewed the Clinical Director.   The Clinical Director checked the shelter's computer system and found no record of contact with WILSON.   The Clinical Director also checked for any mail in WILSON's name, but no items were located.   Several other staff members reviewed photographs of WILSON, but no one recognized him.

13.     On February 2, 2018, I interviewed Individual 1's sister.   She stated that Individual 1 was living in West Virginia out of a white box truck that had been modified to hold a bed, refrigerator, and generator.   Individual 1's sister further stated that she was familiar with WILSON, but that WILSON had never stayed at Address 1.

14.     On March 8, 2018, a member of the West Virginia State Police and of the USMS found WILSON outside at a residence in Marion County, West Virginia.   During an interview, WILSON stated that he was living at Address 2 in Crofton, Maryland.   The law enforcement officers informed WILSON that he was required to register in Maryland or West Virginia, wherever he lives, works or attends school.   WILSON stated that he was returning to Maryland the next day and would register there immediately.

15.     On March 14, 2018, a law enforcement officer spoke with the owner of Address 2 in Crofton, Maryland.   The owner advised that WILSON and Individual 1 had done some odd

4



jobs for him at homes around the area and that, about a month prior, WILSON had sought permission to receive mail at Address 2, but that WILSON had never lived at the location.

16.     While conducting this investigation, law enforcement officers obtained evidence that WILSON was using a Facebook page in the alias "Cletus Vonretchenbatch." This Facebook page shows a picture of WILSON and reflects that the user lives in Bowie, Maryland. Upon reviewing the publicly available information on this page, I saw that "Cletus Vonretchenbatch" (i.e., WILSON) is Facebook friends with Individual 2.   On Individual 2's Facebook page, a photo of WILSON was posted on January 21, 2019, which showed WILSON standing outside with the white box truck in the background.

17.     On February 14, 2019, I located the white box truck parked behind Address 3 in Bowie, MD, in a space marked "RESERVED FOR 48."   I also observed an extension cord running from Address 3 to the truck.

18.     On February 21, 2019, I located the truck, parked in the same position, outside of Address 3 in Bowie, Maryland.   After a short period of time, I observed WILSON come from the back of the truck and get into the passenger seat.

19.     On February 20, 2019, a court in the Northern District of West Virginia authorized a Pen Register and Trap and Trace for WILSON's "Cletus Vonretchenbatch" Facebook account.   These records reflect that on February 21, 2019, WILSON was accessing his Facebook account from an IP address ending 4c12, which is owned by T-Mobile.   On February 27, 2019, WILSON was accessing his Facebook account from an IP address ending ce75, which is also owned by T-Mobile.



20.     T-Mobile records indicate that, on February 21, 2019, and February 27, 2019, respectively, these IP addresses were each assigned to the phone number XXX-XXX-5983, serviced by T-Mobile (Phone x5983).   T-Mobile does not have any subscriber information for this call number because it is a prepaid phone.   However, the account was opened on or about April 21, 2018.

21.     On April 19, 2019, I conducted surveillance of WILSON behind Address 3 in Bowie, MD.   At approximately 11:04 am, an analyst with the USMS placed a phone call to Phone x5983.   I observed WILSON answer the call and get into the back of the white box truck. Additionally, the individual who answered the call identified himself by name, as Kevin Wilson.

22.     Subsequently, on April 25, 2019, this Court (19-1510-TJS) issued a search warrant to T-Mobile for historical cell site and other information associated with Phone x5983 for the period from October 16, 2018 to April 25, 2019.   The return information from T-Mobile reflects that, during this period, the cellular telephone assigned call number Phone x5983 hit off of cellular towers located in Maryland and did not hit off of cellular towers in any other state.

23.     As of April 16, 2019, WILSON was not registered in either Maryland or West Virginia, nor was he registered anywhere else in the United States.

24.     On May 9, 2019, I and other investigators with the USMS arrested WILSON after he exited the passenger side of the white box truck.   WILSON was searched incident to his arrest and investigators found a Samsung Galaxy G7 cellphone in his front right pocket.

25.     Following the arrest, I interviewed the registered owner of the white box truck, Individual 1, who stated that WILSON had been living in the back of the truck with him for about a year.   I provided Individual 1 with a form USM-310, Consent to Search, and read the

6

form aloud to him.   Individual 1 signed the form and gave permission to USMS investigators to search his truck.

26.     During the search of the truck, Individual 1 identified the area where WILSON slept which was the top bed of a bunk bed.   I observed on the side of WILSON's bed, a Samsung Galaxy Core Prime cellphone and a Nu Vision tablet.   These items were seized and placed into evidence with the USMS.

### ELECTRONIC EVIDENCE

27.     As set forth below, there is evidence that WILSON regularly used electronic devices, including a cell phone and devices that can be used to access Facebook.

28.     Based on my training and experience as a USMS Senior Inspector, and prior investigations, I am aware that search warrants on electronic devices, including cell phones and tablets, can provide valuable evidence of criminal wrongdoing including, but not limited to, call logs, contact lists, text messages, GPS locations, photos, videos, applications, documents, e-mails, and notes.

29.     I am also aware, from prior experience, that analysis of the names and telephone numbers contained in cellular telephones as well as sent and received text messages is very useful to law enforcement and provides valuable evidence concerning the scope of the contact on cellular telephones, the location of the devices, and the devices' user.   In addition to the ability to store names and numbers, many cellular telephones have the technical capability to store email, text messages, photos, IP addresses and voice recordings, browse internet websites, and utilize GPS features, which have also proven to be valuable information for law enforcement.



30.     As described above and in Attachments A and B, this application seeks permission to search electronic devices, that is the Subject Property, because there is probable cause to believe relevant records and communications will be stored in that phone or electronic medium.   Specifically:   Cellular telephones, personal digital assistants (PDAs), smart phones, and tablets are computer-type devices capable of creating, storing, and transmitting electronic data and are believed to contain the evidence described in the warrant.

31.     *Forensic evidence.*   Because of the vast number of different devices on the market, and the complexity of analyzing some of the devices, I hereby request the Court's permission to "image" or analyze the device(s), and further seeks permission to locate not only the devices (the "storage medium") that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the devices were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence will be on the Subject Property and will provide the evidence described in Attachment B because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.

c.     Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

d.     Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.



e.  And, computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

32.  As explained herein, information stored within electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, electronic devices typically contain information that log: user account session times and durations, activity associated with user accounts, and the IP addresses through which the device accessed networks and the internet.  Such information allows investigators to understand the chronological context of electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a device may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains



information indicating when the file or image was created.   A person with appropriate familiarity with how a storage medium works can, after examining this forensic evidence in its proper context, draw conclusions about how devices were used, the purpose of their use, who used them, and when.

33.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

34.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.   The later review may require techniques, including but not limited to computer-assisted scans or downloads of the entire medium, using a tool such as Cellebrite, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.



## CONCLUSION

35.     Based on the foregoing, I respectfully submit that there is probable cause to

believe that the Subject Property, further described in Attachment A, contain evidence of the

aforementioned crimes, specifically, 18 U.S.C. § 2250 (Failure to Register as a Sex Offender).

Further, there is probable cause to believe that evidence, fruits and instrumentalities of this

crime, which are listed in Attachment B, which is incorporated herein by reference, are presently

located on the Subject Property.

Roger Wilson, Senior Inspector
United States Marshal Service

Subscribed and sworn to before me on this /7 day of May, 2019.

Hon. Charles B. Day
United States Magistrate Judge

11

**ATTACHMENT A**

DESCRIPTION OF PROPERTY TO BE SEARCHED

1.  A Samsung Galaxy G7 cellphone with serial number R58M34YAC1Z;

2.  A Samsung Galaxy Core Prime cellphone with serial number R58H22ZWP7P; and,

3.  A Nu Vision tablet with serial number 678219516988501125,

(together, the "**Subject Property**"), which are currently secured at 9001 Edmonston Road,

Greenbelt, MD, 20770, in the evidence container maintained by the United States Marshals

Service.



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND SEIZED**

All records, evidence, instrumentalities, or fruits on the **Subject Property** described in Attachment A that relates to violations of 18 United States Code, Section 2250(a), involving Kevin WILSON, as set forth in the affidavit submitted herewith:

*regarding Activity between January 1, 2018 to present     CBD   RJW*

(a) Telephone number(s) associated with the device and all "call logs," which records include the telephone number, date, and time of calls made to and from the phone;

(b) The stored names and phone numbers in electronic "address books;"

(c) Sent and received stored text messages, e-mails and voicemails;

(d) Stored still photographs, moving video and audio files;

(e) Stored dates, appointments, and other information on personal calendars;

(f) All accessed and downloaded information from the Internet including internet connection logs, usernames and passwords;

(g) Any information that reflects or relates to the geographic location of the phone, however stored; and,

(h) The identity of the person (s) who created or used the devices and stored data, including records that help reveal the whereabouts of such person (s).

With respect to the search of the Subject Property, the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

*RJW   CBD*

        a.      surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

        b.      "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

        c.      "scanning" storage areas to discover and possible recover recently deleted files;

        d.      "scanning" storage areas for deliberately hidden files; or

        e.      performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.